The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
July 23, 2020

## 2020COA111

## No. 17CA2249, *People v McBride* — Regulation of Vehicles and Traffic — Equipment — Tail Lamps and Reflectors

A division of the court of appeals considers whether section

42-4-206(1), C.R.S. 2019, which requires motor vehicles to be

equipped with tail lamps emitting red light, prohibits tail lamps

from emitting some white light along with red light. The division

concludes that it does, as the statute requires taillights to shine

only red light. Therefore, the division affirms the judgment for this

traffic infraction and affirms the use of the infraction as justification

for a traffic stop.

The division further considers whether section 42-4-903(1),

C.R.S. 2019, which requires the use of a turn signal before turning

or moving right or left upon a roadway, requires drivers to signal

when navigating a roundabout. The division concludes that it does

not, as the statute does not apply to roundabouts. Therefore, the division reverses the judgment for this traffic infraction.

Finally, the division considers whether the prosecution presented sufficient evidence to establish that the defendant knowingly possessed a firearm as a prior offender. The division concludes that the prosecution did not and therefore reverses the defendant's conviction for the possession charge.

Court of Appeals No. 17CA2249
Mesa County District Court No. 17CR190
Honorable Valerie J. Robison, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Timothy Robert McBride,

Defendant-Appellant

JUDGMENT AFFIRMED IN PART
AND REVERSED IN PART

Division V
Opinion by JUDGE GOMEZ
J. Jones and Welling, JJ., concur

Announced July 23, 2020

Philip J. Weiser, Attorney General, John T. Lee, Senior Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Jacob B. McMahon, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     In this criminal case, we address two issues of first impression in this state: (1) whether section 42-4-206(1), C.R.S. 2019, which requires motor vehicles to be equipped with tail lamps emitting red light, prohibits tail lamps from emitting some white light along with red light; and (2) whether section 42-4-903(1), C.R.S. 2019, which requires the use of a turn signal before turning or moving right or left upon a roadway, requires drivers to signal when navigating a roundabout. We conclude that the answer to the first question is "yes" and the answer to the second is "no." We also conclude that the evidence doesn't support a finding that the defendant, Timothy R. McBride, knew about the gun found in the car he was driving. Accordingly, we affirm Mr. McBride's traffic infraction for a tail lamp violation but reverse his traffic infraction for failure to signal and his conviction for possession of a weapon by a previous offender (POWPO).

## I.     Background

¶ 2     One night, while sitting in an unmarked police car surveilling a hotel for illicit drug activity, a sheriff's deputy saw a Lincoln Town Car with two people in it pull into the parking lot, park for less than ten minutes without anyone getting into or out of the car, and drive

away.  He relayed his observations to another deputy, who followed the Lincoln from another unmarked police car.

¶ 3     The second deputy, as she followed the Lincoln, noticed that both of the car's tail lamps were broken and that, although the lamps had been patched with red tape, the tape was melted and the bulbs emitted some white light along with red light.  The deputy also observed the Lincoln navigate a roundabout without signaling and continue straight on the same road.  She radioed a third deputy in a marked patrol car to stop the Lincoln and investigate the two traffic infractions.

¶ 4     The third deputy pulled the Lincoln over and identified the driver as Mr. McBride and his passenger as M.S.  Additional officers and a police dog arrived at the scene.  The officers arrested Mr. McBride on an outstanding warrant.  Meanwhile, the dog alerted to the presence of illegal narcotics in the car.  Upon searching the car, officers found a bag of methamphetamine between the floorboards and a handgun wedged between the driver and front passenger seats under M.S.'s purse.  M.S. also had drug paraphernalia on her person.

¶ 5      The prosecution charged Mr. McBride with five offenses: (1) possession of a controlled substance; (2) a special offender sentence enhancement for possession of a firearm; (3) POWPO; (4) a traffic infraction for an improper tail lamp; and (5) a traffic infraction for failure to signal for a turn.[1]

¶ 6      Mr. McBride filed a motion to suppress evidence of the drugs and the gun as fruits of an illegal traffic stop. After a hearing, the court denied the motion, ruling that there was reasonable suspicion to stop Mr. McBride for the two traffic infractions.

¶ 7      Mr. McBride's defense at trial was that the drugs and gun belonged to his passenger, M.S., and that he didn't see them or know they were in the car. The jury convicted him of POWPO and the two traffic offenses. It acquitted him of the drug possession charge, which mooted the special-offender enhancer. The court imposed a two-year prison sentence for the POWPO offense (an aggravated sentence due to the court's finding that Mr. McBride was on probation at the time of the offense) and assessed monetary penalties for the traffic offenses.

---

[1] M.S. was separately charged with related offenses.

## II.  Analysis

¶ 8     Mr. McBride raises four issues on appeal: (1) the evidence doesn't support the traffic offenses for a tail lamp infraction and failure to signal; (2) the trial court erred by denying the motion to suppress; (3) the evidence doesn't support the conviction for POWPO; and (4) the enhancement of his sentence based on his probationary status at the time of the offense was illegal.  On the first issue, we conclude that there is sufficient evidence to support the tail lamp infraction but not the failure to signal infraction.  On the second, we conclude that, because of the tail lamp infraction, officers had reasonable suspicion for the traffic stop.  And on the third, we conclude that there is insufficient evidence to support the POWPO conviction.  Our conclusion on the third issue moots the fourth, and therefore we don't address it.

### A.  Traffic Infractions

¶ 9     Mr. McBride contends that there is insufficient evidence to support the two traffic infractions.  We disagree as to the tail lamp infraction but agree as to the failure to signal infraction.

### 1.    Standard of Review

¶ 10    We review sufficiency of the evidence challenges de novo, applying the substantial evidence test. *People v. McCoy*, 2015 COA 76M, ¶ 37, *aff'd on other grounds*, 2019 CO 44. Under this test, we consider whether the evidence, viewed as a whole and in the light most favorable to the prosecution, is sufficient to support a rational conclusion that the defendant is guilty of the offense beyond a reasonable doubt. *Id.*

¶ 11    Where a sufficiency of the evidence challenge requires our interpretation of a statute, our goal is to effectuate the General Assembly's intent. *Id.* at ¶ 38. To determine that intent, we start with the language of the statute, giving words and phrases their plain and ordinary meanings. *Id.* We must read and consider the statutory scheme as a whole, giving consistent, harmonious, and sensible effects to all of its parts. *Id.* If the language is clear and ambiguous, we will apply it as written, without resorting to further statutory analysis. *Id.*

## 2. Tail Lamp Infraction

¶ 12 Mr. McBride's sufficiency challenge to the tail lamp infraction turns on interpretation of the applicable statute. That statute, section 42-4-206(1), provides that

> [t]o be operated on a road, every motor vehicle . . . must be equipped with at least one tail lamp mounted on the rear, which, when lighted as required in section 42-4-204, *emits a red light plainly visible from a distance of five hundred feet to the rear* . . . .

(Emphasis added.) The statute further provides that vehicles manufactured after 1958, like the vehicle in this case, "must be equipped with at least two tail lamps mounted on the rear . . . which . . . comply with this section." *Id.* Section 42-4-204, C.R.S. 2019, in turn, requires vehicles to display lighted lamps between sunset and sunrise and at other times when conditions are unfavorable.

¶ 13 The parties dispute whether section 42-4-206(1) requires that tail lamps shine *only* red light, or whether it simply requires that lamps shine red light without prohibiting lamps from also shining other colors. We conclude, for several reasons, that the statute requires tail lamps to shine only red light.

6

¶ 14    First, giving the words their plain and ordinary meanings, the statute signifies that tail lamps must shine only red.  The statute doesn't say a tail lamp must shine red, along with any other colors. It only says "red."  Further, allowing the use of additional colors would detract from uniformity and uniform enforcement of the law. If tail lamps had red light mixed with a host of other colors, there would no longer be uniformity in tail lamps shining as red.  And if a tail lamp shone a lot of white light with a smidge of red but could be perceived as faintly red at a 500-foot distance, that would introduce subjectivity on the part of police.  Therefore, to promote uniformity and apply the plain language of the statute, "red" must mean "red" and only "red."  *See People v. Wright*, 742 P.2d 316, 321 n.7 (Colo. 1987) ("In Colorado, the legislature has expressly stated that, as a matter of policy, traffic laws and enforcement throughout the state should be uniform." (citing § 42-4-102, C.R.S. 2019)).

¶ 15    Second, another subsection of section 42-4-206 requires "a tail lamp or a separate lamp" to illuminate the rear registration plate "with a white light."  § 42-4-206(3).  This provision suggests that tail lamps can include white lights, but only for the purpose of illuminating the rear plate.

¶ 16    Third, other provisions of the traffic code allow or require lamps in colors other than red.  For instance, section 42-4-215(1), C.R.S. 2019, requires vehicles to have stop lamps on the rear that "display a red or amber light, or any shade of color between red and amber" when the driver applies the brake.  Section 42-4-215(2) requires vehicles to have flashing turn signal lamps in the front "display[ing] a white or amber light, or any shade of color between white and amber" and in the rear "display[ing] a red or amber light, or any shade of color between red and amber."  Section 42-4-215(7) permits vehicles to have hazard lights on the front flashing "white or amber lights, or any shade of color between white and amber" and on the rear flashing "amber or red lights, or any shade of color between amber and red."  Section 42-4-215(8) permits vehicles to have up to three identification lamps in the front and up to three such lamps in the rear, with any front lamps "emit[ting] an amber light" and any rear lamps "emit[ting] a red light."  And section 42-12-204, C.R.S. 2019, permits street-rod or custom vehicles to use

8

"blue dot tail lights" (red lamps with blue or purple inserts) for stop lamps, rear turn signal lamps, and rear hazard lamps.[2]

¶ 17    Collectively, these provisions suggest that when the legislature says "red" it means only "red" and when it says "amber" or "white" it means only "amber" or "white." They also suggest that where more than one color is permitted, the legislature says so — for instance in permitting any shade of color between white and amber or between red and amber for certain types of lamps and permitting the use of blue dot tail lights for certain lamps on certain vehicles. But in enacting section 42-4-206(1), the legislature chose to say only "red light," suggesting that red is the only permissible light color for tail lamps. *See Cain v. People*, 2014 CO 49, ¶ 13 ("Under the rule of interpretation *expressio unius exclusio alterius*, the inclusion of certain items implies the exclusion of others." (quoting *Beeghly v. Mack*, 20 P.3d 610, 613 (Colo. 2001))).

¶ 18    And fourth, as these various provisions demonstrate, specific colored lights on a vehicle carry significance. *Cf. Tidwell ex rel. Tidwell v. City & Cty. of Denver*, 83 P.3d 75, 78, 83 (Colo. 2003)

---

[2] This is by no means an exhaustive list of the statutory provisions regarding lamp colors. It is meant only to be illustrative.

9

(explaining the significance of the use of red, blue, and white rotating "stage two" lights on police cars). Front lights are generally white or amber, and rear lights are generally red (or sometimes amber). The only white lights on the rear of a car are generally the small license plate lamp and backup lamps (which illuminate only when a driver is backing up).[3] This uniformity of lighting helps drivers ascertain what direction a car is facing and whether it is backing up. Permitting vehicles to emit white light (even if mixed with red) from tail lamps could therefore lead to confusion and accidents. *See Gallagher Transp. Co. v. Giggey*, 101 Colo. 116, 120, 71 P.2d 1039, 1042 (1937) (a driver has a right to assume other vehicles will be lawfully lighted).

¶ 19    Our interpretation is consistent with the majority view in other jurisdictions to have considered similar statutory provisions. *See, e.g., Williams v. State*, 853 P.2d 537, 538 (Alaska Ct. App. 1993)

---

[3] Although state law doesn't require backup lamps to be any specific color, § 42-4-215(6), C.R.S. 2019, federal standards and regulations have required white backup lamps since the late 1960s. *See* David W. Moore & Kåre Rumar, *Historical Development and Current Effectiveness of Rear Lighting Systems* 11-12, 38-39 (Univ. of Mich. Transp. Research Institute Oct. 1999), https://perma.cc/WTY3-2FEH; *see also* 49 C.F.R. § 571.108(S7.6) & tbl. I-a (2019).

("We . . . interpret [the statute] to require that taillights emit only red light."); *Robinson v. State*, 431 S.W.3d 877, 879 (Ark. 2014) ("Th[e] statute does not contemplate a taillight that displays a white light in addition to a red light."); *State v. Patterson*, 97 P.3d 479, 482 (Idaho Ct. App. 2004) ("Based upon the plain reading of [the statutory sections, the defendant] violated Idaho law by driving with taillights that emit light of a color other than red."); *People v. Allen*, 933 N.Y.S.2d 756, 759 (App. Div. 2011) ("We hold that the statute requires a tail light to display only red light."). *But see Vicknair v. State*, 670 S.W.2d 286, 287 (Tex. App. 1984) (a taillight complies with state statute so long as it emits red light visible at the required distance, even if it also emits white light), *aff'd on other grounds*, 751 S.W.2d 180 (Tex. Crim. App. 1986).

¶ 20    Our interpretation also comports with *People v. Brant*, 252 P.3d 459, 463 (Colo. 2011), in which our supreme court said that an investigatory stop for a violation of section 42-4-206 was justified when a vehicle had a broken tail lamp. Although we acknowledge that the statute regulates color, not brokenness, *Brant* supports our interpretation that a broken tail lamp that emits some white light along with red light violates the statute.

11

¶ 21    Accordingly, we affirm the traffic infraction for an improper tail lamp.

### 3.    Turn Signal Infraction

¶ 22    Mr. McBride's sufficiency challenge to the turn signal infraction also turns on interpretation of the applicable statute. That statute, section 42-4-903, provides, in relevant part:

> (1) No person shall *turn a vehicle at an intersection . . . , or turn a vehicle to enter a private road or driveway,* or *otherwise turn a vehicle from a direct course or move right or left upon a roadway* unless and until such movement can be made with reasonable safety and then only after giving an appropriate signal in the manner provided in sections 42-4-608 and 42-4-609.

> (2) A signal of intention to turn right or left shall be given continuously during not less than the last one hundred feet traveled by the vehicle before turning in urban or metropolitan areas and shall be given continuously for at least two hundred feet on all four-lane highways and other highways where the prima facie or posted speed limit is more than forty miles per hour.

(Emphasis added.)  The referenced sections 42-4-608 and 42-4-609, C.R.S. 2019, describe signaling via lamps or hands and arms when such signals are required by statute.

¶ 23     The parties dispute whether these provisions require a driver

to signal when navigating a roundabout.[4]

¶ 24     Notably, only one traffic code provision expressly addresses

roundabouts.  That provision, section 42-4-1006(2), C.R.S. 2019,

says "[a] vehicle passing around a rotary traffic island shall be

driven only to the right of such island."

¶ 25     The question, then, is whether any of the actions described in

section 42-4-903(1) — turning at an intersection, turning to enter a

private road or driveway, otherwise turning from a direct course,

and moving right or left upon a roadway — encompass driving

through a roundabout.  The People focus largely on the provision

requiring signaling when moving right or left upon a roadway,

urging that drivers necessarily move right or left upon the roadway

when they drive through a roundabout.

¶ 26     Two other jurisdictions have addressed this issue under

similar statutory provisions: Alaska and Indiana.  Both held that

---

[4] Although the People argued in the trial court and on appeal that signaling is required only when *exiting* a roundabout — not when *entering* one — neither the information nor the verdict form or mittimus so specified.  Accordingly, we consider any signaling requirements for either entering or exiting a roundabout.

13

their statutes regarding the use of turn signals don't apply to roundabouts.[5]  We find their reasoning persuasive and conclude for the same reasons that section 42-4-903(1) doesn't require a driver to signal when entering or exiting a roundabout.

¶ 27     In *Noble v. State*, the Alaska Court of Appeals gave several reasons for its decision that the state's traffic laws don't require drivers to use a turn signal when entering or exiting a roundabout. 357 P.3d 1201, 1201-06 (Alaska Ct. App. 2015).  Those same reasons apply equally here.

¶ 28     First, the court cited the state laws expressly applying to roundabouts.  *Id.* at 1202.  As with Colorado's laws, none of the provisions addressed signaling.  *Id.*

¶ 29     Next, the court turned to the general provisions on signaling. *Id.* at 1202-03.  Although not identical to Colorado's laws, these provisions similarly require the use of a signal when a motorist turns or moves right or left upon, off, or on a roadway.  *Id.* at 1202.

---

[5] In a third case, the Eighth Circuit declined to decide whether state law required drivers to signal in a roundabout; the court held only that a traffic stop based on failure to signal was reasonable because the officer could reasonably have believed it was a violation.  *United States v. Gadson*, 670 F. App'x 907, 909 (8th Cir. 2016).

They also similarly require continuous use of a signal for the last hundred feet before turning. *Id.* at 1202-03. (Colorado's law differs in that this 100-foot requirement applies only in urban or metropolitan areas and that a longer, 200-foot requirement applies on any highway that is four-laned and/or has a posted speed limit exceeding forty miles per hour. § 42-4-903(2).)

¶ 30 The *Noble* court noted that Alaska's provisions mirror those of the 1969 Uniform Vehicle Code, which was drafted before roundabouts became widespread. 357 P.3d at 1203. It further noted that the uniform code had last been amended in 2000, and that none of the 2000 amendments mentioned roundabouts. *Id.* It cited sources indicating that, as of 1997, a few years before the most recent amendments, there were only three dozen roundabouts in the entire nation. *Id.* Although none of those was in Alaska, according to one of the cited sources, ten were in Colorado. Transp. Research Bd., *Modern Roundabout Practice in the United States* 14 (1998), https://perma.cc/5S4M-JN7P.

¶ 31 The point, the court explained, is that the uniform code provisions cannot be readily applied to roundabouts because they were drafted at a time when roundabouts weren't common. *Noble,*

15

357 P.3d at 1203-04.  This limitation applies equally to Colorado's signaling provisions, which likewise are based on and similar to the model code provisions.  *See* § 42-4-102 (legislative declaration stating a purpose of "conforming, as nearly as possible, certain of the traffic laws of this state with the recommendations of the national committee of uniform traffic laws and ordinances as set forth in the committee's 'Uniform Vehicle Code'"); *see also* Nat'l Comm. of Unif. Traffic Laws & Ordinances, *Uniform Vehicle Code and Model Traffic Ordinance* § 11-604(a)-(b) (1969), https://perma.cc/TW3U-QQUJ (uniform code provisions nearly identical to those in section 42-4-903(1)-(2)).

¶ 32     The *Noble* court further elaborated on why existing signaling laws don't readily apply to roundabouts.  357 P.3d at 1204.  For instance, the court explained, while one could view movement into a roundabout as movement right or left upon a roadway (for which a turn signal is required), it was more accurate to view such movement as following a curve in the roadway (for which a turn signal is not required).  *Id.*  And so "[i]t seems counter-intuitive to require all motorists to activate their right-turn signals when entering a roundabout if they simply wish to drive around the

16

center island and continue in their original direction of travel." *Id.*

Moreover, "if a motorist *did* activate their right-turn signal, this right-turn signal might well confuse other motorists who were already inside the roundabout, or who were waiting to enter the roundabout from a different direction," and who "might easily suppose that the signaling motorist actually intended to turn right (onto an intersecting road) rather than continuing straight through the roundabout." *Id.*

¶ 33    Because of such difficulties with applying existing law to roundabouts, the court went on, some states had enacted new laws or created websites or informational pamphlets directly addressing the issue. *Id.*; *see also Nickerson v. Portland Police Bureau*, No. CIV. 08-217-HU, 2008 WL 4449874, at *5 (D. Or. Sept. 30, 2008) (unpublished order) (reviewing a challenge to an Oregon law directly addressing signaling in roundabouts).  In Alaska, the legislature hadn't passed any laws on point, the department of transportation hadn't provided any guidance, and a university website had indicated that motorists on campus "will want to" signal when they exit a roundabout. *Noble*, 357 P.3d at 1205.  "The result is that no one can determine, with any degree of surety, what rules apply." *Id.*

17

So, too, in Colorado, where there are no laws or departmental guidance directly on point and the driver handbook doesn't indicate whether signaling is required in roundabouts. *See* Colo. Dep't of Rev., Div. of Motor Vehicles, *Colorado Driver Handbook* 19 (2017), https://perma.cc/763H-TPYS (stating, as to roundabouts, only that drivers should "[y]ield to traffic already within the rotary island" and "[d]rive to the right and watch for directional signs and signals").

¶ 34     Finally, the *Noble* court remarked that the required signaling distance of 100 feet can't readily be applied to roundabouts, where entrances and exits are often less than 100 feet apart. 357 P.3d at 1206. As a result, signaling for that length of time at a roundabout could be confusing and potentially dangerous. *Id.* This concern similarly applies to Colorado, where signaling distances, though not applicable in rural areas, are generally 100 feet (or 200 feet for any roundabouts that may exist on four-lane highways or highways with posted limits above forty miles per hour).

¶ 35     For all these reasons, the court in *Noble* concluded that there was "no clear way to apply the signaling provisions of [state law] to roundabouts." *Id.* And because any attempt at clarification would amount to "creating new rules, based on a weighing of facts and

18

policies that is normally entrusted to legislatures or executive agencies," the court declined to stretch the language of the statute to try to make it apply to roundabouts. *Id.* Instead, the court encouraged the legislature or department of public safety to address the issue if they feel it appropriate to do so. *Id.*

¶ 36 The Indiana Court of Appeals recently applied similar reasoning in considering this same issue under its state's laws. *State v. Davis*, 143 N.E.3d 343, 347-49 (Ind. Ct. App. 2020). The *Davis* court noted that the state's traffic laws expressly addressing roundabouts don't touch on signaling; its general provisions on signaling were enacted before roundabouts became widespread in the state; motorists entering a roundabout are simply following the curve of the road, which would make use of a signal "nonsensical"; requiring the use of a signal for exiting a roundabout would be "problematic" because it would be unclear how and when the motorist would need to signal; and, with the multitude of roundabout configurations across the state, it would be difficult to ascertain just how to apply existing law. *Id.* And, like the Alaska court, it ultimately concluded that state law on signaling doesn't apply to roundabouts and that it is up to the legislature, not the

19

court, to promulgate rules for roundabouts if it chooses to do so. *Id.* at 349.

¶ 37    We find the analysis in *Noble* and *Davis* persuasive and conclude for the same reasons that section 42-4-903(1) does not apply to motorists entering or exiting a roundabout.

¶ 38    The one notable difference in Colorado is that a failed bill in 2017 would have expressly provided that turn signals are not required in roundabouts.  S.B. 17-059, 71st Gen. Assemb., 1st Reg. Sess.  The bill summary suggests that its proponents believed existing law does require signaling in roundabouts.  *See* S.B. 17-059, 71st Gen. Assemb., 1st Reg. Sess. (as introduced), https://perma.cc/6LPB-573N ("Currently, a person must signal an intention to turn before turning or changing lanes while driving a vehicle.  The bill exempts motor vehicles that are using a roundabout unless otherwise posted.").  But the bill died in the Senate and was never introduced in the House.  *See* S. Journal, 71st Gen. Assemb., 1st Reg. Sess. 178 (Feb. 10, 2017).

¶ 39    This unsuccessful legislative proposal doesn't affect our interpretation of existing law.  "[T]he 'interpretation placed upon an existing statute by a subsequent group of [legislators] who are

20

promoting legislation and who are unsuccessful has no persuasive significance.'" *Minto v. Sprague*, 124 P.3d 881, 885 (Colo. App. 2005) (quoting *United States v. Wise*, 370 U.S. 405, 411 (1962)); *see also In re Marriage of Heupel*, 936 P.2d 561, 570 n.10 (Colo. 1997) ("[W]hile 'unsuccessful attempts to amend proposed legislation during the process of enactment' is relevant in interpreting the adopted measure, the same does not hold true for 'unsuccessful attempts to amend a measure passed by a previous legislative session.'" (quoting *Tahoe Reg'l Planning Agency v. McKay*, 769 F.2d 534, 538 (9th Cir. 1985))).

¶ 40   Accordingly, we reverse the traffic infraction for failure to signal.

### B.   Reasonable Suspicion for the Traffic Stop

¶ 41   Mr. McBride next contends that the officers lacked probable cause for the traffic stop. We disagree.

¶ 42   A trial court's order on a motion to suppress presents a mixed question of law and fact. *People v. Burnett*, 2019 CO 2, ¶ 13. We accept the trial court's factual findings if they are supported by competent evidence on the record, but we assess the legal

significance of those facts de novo.  *Id.*  We also review related issues of statutory interpretation de novo.  *Id.*

¶ 43     The trial court denied the motion to suppress based on a finding that officers had reasonable suspicion to conclude that Mr. McBride violated two traffic provisions — the tail lamp provision and the signaling provision.  The evidence presented at the suppression hearing, like the evidence at trial, established that the Lincoln's tail lamps emitted both red and white light.  Because we have concluded that this violates section 42-4-206(1), there was sufficient basis for the stop.  Accordingly, although Mr. McBride didn't violate the signaling provision, we needn't consider whether officers nonetheless had a reasonable basis for concluding he may have done so.

## C.    POWPO

¶ 44     Finally, Mr. McBride contends that the evidence was insufficient to support the POWPO conviction — specifically, the required element that he knowingly possessed a firearm.  We agree.

22

## 1. Additional Facts

¶ 45 When Mr. McBride was pulled over in the Lincoln, he was riding with a passenger, M.S., seated in the front passenger seat. The car wasn't registered to either of them.

¶ 46 The arresting officer didn't see Mr. McBride or M.S. make any furtive movements, as if to hide evidence, while Mr. McBride was pulling the car over. Nor did the officer see any guns when he looked into the car upon making initial contact with Mr. McBride or upon returning to the car to arrest Mr. McBride (after discovering the outstanding warrant). Mr. McBride didn't attempt to flee but cooperated with officers during the arrest.

¶ 47 Later, in a full search of the car, officers found a handgun in the crevice between the driver and front passenger seats, under M.S.'s purse. The inside of the car was messy, with items strewn about, making it difficult to discern specific items. And the gun wasn't visible, even from inside the car, until the purse was moved.

¶ 48 There was no evidence that the gun was registered or otherwise belonged to Mr. McBride or that it was stolen. There was

also no evidence that Mr. McBride's fingerprints or DNA were found on the gun or on any other items in the car.[6]

## 2. Standard of Review

¶ 49    In reviewing a sufficiency of the evidence challenge, we review the record de novo to determine whether the evidence presented was sufficient in both quantity and quality to sustain the defendant's conviction. *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010); *see also McCoy*, ¶ 37.

¶ 50    Under the applicable substantial evidence test, we consider "whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." *Clark*, 232 P.3d at 1291 (quoting *People v. Bennett*, 183 Colo. 125, 130, 515 P.2d 466, 469 (1973)). The relevant question under this test is "whether, after viewing the evidence in the light most favorable to the prosecution, a rational

---

[6] One of the officers testified that at one point during the traffic stop M.S. pretended to cry and claimed everything in the car belonged to Mr. McBride. But M.S. didn't testify at trial, and the People don't rely on this evidence to support the POWPO conviction.

trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* "[W]e must give the prosecution the benefit of every reasonable inference which may be fairly drawn from the evidence." *Id.* at 1292. However, "there must be a logical and convincing connection between the facts established and the conclusion inferred." *Id.* "If the evidence is such that reasonable jurors must necessarily have a reasonable doubt, then the evidence is insufficient to sustain the defendant's conviction." *Id.*

### 3. Application

¶ 51 A person commits the crime of POWPO if that person "knowingly possesses, uses, or carries upon his or her person a firearm . . . subsequent to the person's conviction for a felony . . . under Colorado or any other state's law or under federal law." § 18-12-108(1), C.R.S. 2019.

¶ 52 The question in this case is whether the prosecution presented sufficient evidence to prove, beyond a reasonable doubt, that Mr. McBride knowingly possessed the handgun found in the car he was driving. We conclude that it did not.

¶ 53 "'[P]ossession,' as it is used in [POWPO], is the actual or physical control of the firearm." *People v. Allgier,* 2018 COA 122,

25

¶ 65 (quoting *Beckett v. People*, 800 P.2d 74, 82 (Colo. 1990)).  "[A] defendant need not have had exclusive control of the firearm to be found guilty of possessing it."  *Id.* at ¶ 66.

¶ 54    Nonetheless, the possession must be "knowing."  *See People v. Tenorio*, 197 Colo. 137, 144, 590 P.2d 952, 957 (1979) ("To convict one of possessing a weapon, the jury must find, not mere possession, but that the defendant 'knowingly' possessed the weapon and that he understood that the object possessed was a weapon."); *see also People v. Van Meter*, 2018 COA 13, ¶¶ 38, 43-44 (trial court didn't plainly err by instructing the jury that "[p]ossession constitutes a voluntary act if the actor was aware of his physical possession or control thereof for a sufficient period to have been able to have terminated it").  "A person acts 'knowingly' . . . with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists."  § 18-1-501(6), C.R.S. 2019.

¶ 55    In the related context of knowing possession of controlled substances, it is well settled that "the 'controlled substance need not be found on the person of the defendant, as long as it is found

in a place under his or her dominion and control.'" *People v. Yeadon*, 2018 COA 104, ¶ 24 (quoting *People v. Atencio*, 140 P.3d 73, 75 (Colo. App. 2005)), *aff'd on other grounds*, 2020 CO 38. "If a 'defendant has exclusive possession of the premises in which drugs are found, the jury may infer knowledge from the fact of possession.'" *Id.* at ¶ 25 (quoting *People v. Baca*, 109 P.3d 1005, 1007 (Colo. App. 2004)). For instance, "[k]nowledge can be inferred from the fact that the defendant is the driver and sole occupant of a vehicle, irrespective of whether he is also the vehicle's owner." *Id.* (quoting *Baca*, 109 P.3d at 1007). "Conversely, 'where a person is not in exclusive possession of the premises in which drugs are found, such an inference may not be drawn 'unless there are statements or other circumstances tending to buttress the inference.'" *Id.* at ¶ 26 (quoting *People v. Stark*, 691 P.2d 334, 339 (Colo. 1984)).

¶ 56     Thus, it is clear, in the context of knowing possession of a controlled substance, that where a defendant is not in exclusive possession of a car or premises in which an illegal object is found, "[m]ere presence without another additional link in the evidence will not sustain a conviction for possession." *Id.* (quoting *Feltes v.*

27

*People*, 178 Colo. 409, 417, 498 P.2d 1128, 1132 (1972)).  We find this equally true in the context of knowing possession of a firearm and, therefore, we apply the same standards here.

¶ 57    Indeed, in both contexts, divisions of this court have applied similar reasoning in affirming convictions for knowing possession where the prosecution presented evidence of something more than a defendant's mere proximity to a gun or drugs.  *See, e.g., People v. Kessler*, 2018 COA 60, ¶¶ 13-14 (the defendant sat in a car for much of the day just inches away from the cocaine found uncovered and plainly visible in the console); *Yeadon*, ¶ 28 (the defendant was in direct proximity to a visible bag of methamphetamine in the driver's side door compartment of the car he'd been driving before he fled); *People v. Warner*, 251 P.3d 556, 565-66 (Colo. App. 2010) (the defendant exercised dominion and control over the residence where two guns were found, he was seen holding one of the guns the day before it was seized and later sitting at a table inside the residence with the same gun, and he owned the safe where the second gun was found); *People v. Jackson*, 98 P.3d 940, 945 (Colo. App. 2004) (the victim identified the gun as belonging to the defendant); *People v. Tramaglino*, 791 P.2d 1171, 1171-72 (Colo.

App. 1989) (eyewitness testified that the defendant had the gun in his possession, and it was later found in his car).

¶ 58    Here, however, the prosecution didn't offer evidence of that "something more." For instance, there was no evidence that Mr. McBride owned or had exclusive possession of the car, that he owned or had stolen the gun, that he had ever touched the gun, that when officers approached he tried to flee or made furtive movements in an effort to hide the gun, that the gun was in plain view in the car, or that he made any statements indicating his knowledge of the gun's presence in the car.

¶ 59    In this circumstance, where the defendant is not in exclusive possession of the car or premises in which an object is found and there is no evidence aside from mere proximity linking the defendant to that object, a conviction premised on knowing possession cannot stand. This is because any finding that the defendant knowingly possessed the object would necessarily be based on speculation. But "verdicts in criminal cases may not be based on guessing, speculation, or conjecture," and "a modicum of relevant evidence will not rationally support a conviction beyond a

reasonable doubt." *People v. Sprouse*, 983 P.2d 771, 778 (Colo. 1999).

¶ 60    That critical difference is what distinguishes this case from *People v. Rivera*, 765 P.2d 624 (Colo. App. 1988), *rev'd on other grounds*, 792 P.2d 786 (Colo. 1990), on which the People rely. In *Rivera*, the defendant accompanied his wife when she bought the gun in question and then was found in his home with the gun in plain view within arm's reach. *Id.* at 628. No such facts are present here. In particular, no evidence suggests that Mr. McBride had any prior knowledge of the gun or that the gun was in his plain view when it was discovered.

¶ 61    That difference also sets this case apart from *People v. Donald*, in which our supreme court recognized that "[k]nowledge . . . may be inferred from circumstantial evidence." 2020 CO 24, ¶ 37. The question in *Donald* was whether the prosecution could establish the required element of knowledge — in that case, knowledge of the bail condition prohibiting the defendant from leaving the state without permission — through stacked inferences. *Id.* at ¶¶ 3-11, 26. The court held that inference stacking is not prohibited but is simply

one factor a court may consider in determining whether evidence satisfies the substantial evidence test. *Id.* at ¶¶ 26-31.

¶ 62    Applying this framework, the court in *Donald* held that (1) sufficient evidence supported an inference that the defendant signed his bond paperwork, including the bondsperson's testimony that only by accident would anyone be released from jail without signing the paperwork, defense counsel's concession that the defendant signed the paperwork, and a copy of the signed paperwork; and (2) sufficient evidence supported an inference that the defendant saw and was aware of the bond condition, including the fact that the bond paperwork consisted of a single page and that the subject condition was the first condition listed under a bolded heading of additional conditions. *Id.* at ¶¶ 38-41.

¶ 63    Here, the issue is not one of stacked inferences — just a single inference that lacks any direct or circumstantial evidence, aside from mere proximity, to support it. Still, some of the reasoning from *Donald* might apply if, for instance, the gun had been found in plain view or if the car had been in Mr. McBride's exclusive possession. Then there could be a question whether Mr. McBride had actual knowledge of the gun's presence, and *Donald* could

31

support an inference of actual knowledge based on those circumstances. But no such circumstances exist here.

¶ 64    Indeed, in similar cases, other courts have reversed firearm-related convictions where the prosecution didn't establish anything more than the defendant's mere proximity to the firearm in a car. For instance, in *Commonwealth v. Snow*, which is remarkably similar to this case, the defendant was driving a car that wasn't his, there were other passengers in the car, no one made any furtive movements as the car was being pulled over, and police ultimately found a gun that was not plainly visible but was tucked between the driver's seat and the front console. 920 N.E.2d 68, 69-72 (Mass. App. Ct. 2010). Under those circumstances, the court held that "[t]he evidence was insufficient 'to warrant a reasonable inference of personal knowledge of the presence of the gun,' and the conviction [for firearm offenses] cannot stand." *Id.* at 72 (citation omitted).

¶ 65    Other cases are in accord. *See, e.g., United States v. Hishaw*, 235 F.3d 565, 571-73 (10th Cir. 2000) (evidence showed only that a gun was found under the passenger's seat of a car the defendant didn't own but was driving); *Jones v. State*, 924 N.E.2d 672, 675-76

(Ind. Ct. App. 2010) (evidence showed only that the defendant was test-driving a customer's car in which a gun was found under the driver's seat and that he made furtive gestures that appeared to be related to hiding alcohol in the car); *State v. Harris*, 895 N.W.2d 592, 602-03 (Minn. 2017) (evidence showed only that the defendant was driving a car he didn't own with two passengers, he continued driving for a few blocks after an officer activated his vehicle lights and siren, the officer saw movement in the car, a gun was eventually found in a void between the headlining and roof of the car near the sunroof, where it wasn't immediately visible, and DNA testing on the gun was inconclusive); *Hancock v. Commonwealth*, 465 S.E.2d 138, 140-41 (Va. Ct. App. 1995) (evidence showed only that the defendant was riding in the back seat of a car in which a firearm was found in front of him under the driver's seat and "[n]o evidence established that [he] ever held the firearm, saw it, knew it was present, or exercised any dominion and control over it").

¶ 66     The facts here demand the same result.  Accordingly, we conclude that the evidence is insufficient to support the POWPO conviction, and we reverse that conviction.

### III.    Conclusion

¶ 67     We affirm the traffic infraction for the tail lamp violation but reverse the traffic infraction for failure to signal and the judgment of conviction for POWPO.

JUDGE J. JONES and JUDGE WELLING concur.